UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
UNITED STATES OF AMERICA,

     -against-

ANTHONY RUSSO,
VICTOR J. ORENA, PASQUALE
AMATO, CARMINE SESSA,
MICHAEL SESSA, LAWRENCE A.
FIORENZA, LAWRENCE MAZZA,
JOSEPH RUSSO, ROBERT
ZAMBARDI, JOSEPH
MONTELEONE, SR., ALPHONSE
PERSICO, JOSEPH TOMASELLO,
THEODORE PERSICO, RICHARD
FUSCO, and JAMES DELMASTRO,

               Defendants.
-----------------------------------------------x

UNITED STATES OF AMERICA,

     -against-

PAUL MOORE,
ERIC VASSELL, DONALD VASSELL,
ROBERT W. BELL, PAUL A. MOORE,
COURTNEY MCCALLUM, ALVIN
ANTHONY GRANT, ROHAN
MCGEACHY, STEVE ROBINSON,
ANDREW BARRINGTON, IVOR
PARKER, ANTHONY WILLIAMS,
LARKLAND ABLE, DESMOND
BROWN, DENNIS WINSTON DUNN,
BARRIS WILLIAMS, CHRISTOPHER
RODRIGUES BENTLEY, NIGEL

**MEMORANDUM**
Case No. 92-CR-351

**MEMORANDUM**
Case No. 90-CR-1063

1

DEMETRIUS, RONALD LOUIS
DESDUNE, ANTHONY JUNIOR
BOARKE, EVERTON MILLER,
GARFIELD ROBINSON,
MAURICE BAKER, MORRIS
ANTHONY KIRKLAND, SHERWIN
BIRKETT, LENOX WILLIAMS,
HAMILTON SOUTH, KEVIN LNU,
ADOLPH SHAWN, JEFF LNU,
ANTHONY COLQUHOUN, MICHAEL
MYERS, SHAWN MYERS, JAMES
STERLING, EDWARD STERLING,
ANDREW BAMBURY, MICHAEL
LNU, DONALD A. EDWARDS,
LESLIE CHARLES, ROSETTA HINES,
LASHON WARREN, ESTORIA
WALKER, SONJA GRANT, JB
WILLIAMS, KENNETH
WEATHERSPOON TREVOR MCLEOD,
and VAN GEORGE EDWARDS,

      Defendants.

---------------------------------------------------x

*Appearances:*

*For the United States:*
BREON PEACE
United States Attorney
By (as to Anthony Russo):
Devon Lash
Assistant United States Attorney
By: (as to Paul Moore):
Sophia M. Suarez
Assistant United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

*For Defendant Anthony Russo:*
JAMES R. FROCCARO
20 Vanderventer Ave., Suite 103W
Port Washington, NY 11050

*For Defendant Paul Moore:*
Robert L. Begleiter
Hamsa Mahendranathan
Saidah A. Grimes
Elizabeth D. Soltan
Constantine Cannon LLP
335 Madison Avenue, 9th Floor
New York, NY 10017

**BLOCK, Senior District Judge:**

This December will mark the fourth anniversary of the passage of the First Step Act. [1] The Act modified 18 U.S.C. § 3582(c)(1)(A), known as the "compassionate release" statute, which empowers the district courts to reduce a previously imposed sentence. However, a court may only do so "after considering the factors set forth in § 3553(a) to the extent that they are applicable, if [the court] finds that…extraordinary and compelling reasons warrant such a reduction…and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). *See United States v. Gotti*, 433 F. Supp. 3d 613, 615 (S.D.N.Y. 2020) ("[A] defendant who meets all the criteria for compassionate release consideration…is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification."); *Reynolds v. United States*, 2022 WL 1444167, at *4 (E.D.N.Y. May 6, 2022) ("Although often referred to as 'compassionate release,' the statute allows for any sentence reduction—up to and including immediate release—so long as that reduction is warranted by extraordinary and compelling reasons, consistent with the applicable policy statement, and is appropriate in light of the Section 3553(a) factors.").

---

[1] The "First Step Act" is a backronym for the formal title of the Act, which is the Formally Incarcerated Reenter Society Transformed Safely Transitioning Every Person Act.

3

Prior to the First Step Act, the Bureau of Prisons ("BOP") was the sole arbiter of compassionate release applications. Now, defendants apply first to the BOP for relief, and if the BOP denies their application, they may apply directly to the district court. Though this procedural change appears minor, it has had significant impact for inmates: in 2018, only 34 inmates received sentence reduction via compassionate release. In the years since the First Step Act was passed, more than 4,000 sentence reductions have been granted. *See* Federal Bureau of Prisons, *First Step Act*, https://www.bop.gov/inmates/fsa/ (last visited October 25, 2022).

Unsurprisingly, the Act has spawned a plethora of litigation which now makes up a significant part of a district judge's criminal docket. At the heart of the matter is the challenge the district judge faces in deciding which factors the judge can consider in determining whether the "extraordinary and compelling reasons" threshold has been satisfied. This has produced inconsistent caselaw across the country.

In the Second Circuit, a full appreciation of the breadth of the circuit court's unanimous decision in *United States v. Brooker*, 976 F.3d 228 (2020) is the requisite starting point. It is remarkable in a number of respects. Initially, the court sided with the majority of the courts that had ruled that despite Guideline § 1B1.13 and Application Note 1D, which, to this day, still vest the BOP with "the exclusive authority to bring a compassionate release motion before the court," *id.* at 234, the

4

First Step Act has "freed district courts to exercise their discretion in determining what are extraordinary circumstances." *Id.*

Guideline § 1B1.13 and its Application Notes set forth factors that the BOP can consider in determining whether extraordinary and compelling circumstances exist. The court in *Brooker* chose not to abolish them in light of the First Step Act, preferring to "save as much of the Guideline language and policy as possible." *Id.* at 235. It therefore ruled that "though motions by the BOP still remain under the First Step Act, they are no longer exclusive." Consequently, the court "read the Guidelines as surviving, but now applying only to those motions that the BOP has made." *Id* at 235-36.

But what are these surviving Guidelines? Under Guideline § 1B1.13(1) the district court must determine, under subdivision (A), that there are either "extraordinary and compelling reasons to warrant a reduction," or, under subdivision (B), that "the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison under his sentence," provided in each case that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[2]

---

[2] Section 3142(g) provides that factors to be considered in assessing whether a person is a danger to society include the nature and circumstances of the crime, the weight of the evidence against the person, the history and characteristics of the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Under the Application Notes, the Commission identified in three subdivisions under Note 1 the extraordinary and compelling bases for a sentencing reduction: Subdivision (A) speaks to the "Medical Conditions of the Defendant," such as a terminal illness, "a serious physical or medical condition or serious functional or cognitive impairment, or deteriorating physical or mental health because of the aging process," provided that the applicable circumstance "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Subdivision (B) speaks to the "Age of the Defendant." He or she must be "at least 65 years old…experiencing serious deterioration in physical or mental health because of the aging process," and have "served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." And subdivision (C) addresses "Family Circumstances," namely, "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children," or "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."

Apparently recognizing that these circumstances are rather unforgiving, the Commission assuaged their harsh application by providing in subdivision (D) that the BOP could consider whether there exists "an extraordinary and compelling

reason, other than, or in combination with the reasons described in subdivisions (A) through (C)." It further provided, in Note 2, that

> an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement.

But Note 3 provides that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason."[3]

The district court can certainly consider Guideline § 1B1.13 and its Application Notes in determining whether to grant a compassionate release motion, but since they are no longer "'applicable' to compassionate release motions brought by defendants," *Brooker,* 976 F.3d at 236, the court in *Brooker* pronounced that "[n]either Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Id.*

---

[3] 28 U.S.C. §994(a)(2)(C) required the Sentencing Commission to promulgate "general policy statements regarding application of the guidelines or any other aspect of sentencing" including the power of the BOP to modify a sentence for extraordinary and compelling circumstances. The statute was passed in 1984 and in subdivision (t) the Commission was charged with describing "what should be considered extraordinary and compelling reasons for sentence reduction," including the criteria to be applied and a list of specific examples. The only limitation placed on this mandate was, as set forth in §994(t), that "rehabilitation is not, by itself, an extraordinary and compelling reason." It was not, however, until 2006 that the Commission finally acted on this mandate and issued Guideline §1B1.13 and its Application Notes. *See Brooker*, 976 at 232.

Notably, *Brooker* did not address under which circumstances the district court would exceed its compassionate release discretion. It did hold, however, that "a district court's discretion in this area—as in all sentencing matters—is broad." *Id.* at 237.

The *Brooker* court also provided some minimal guidance in remanding to the district court, in the first instance, to exercise its discretion. It commented on the defendant's extensive rehabilitation coupled with the length of his sentence: "Indeed, Congress seemingly contemplated that courts might consider such circumstances when it passed the original compassionate release statute in 1984." *Id.* at 238 (noting that the statute then provided that "reduction may be appropriate when 'other extraordinary and compelling circumstances justify a reduction of an *unusually long sentence*'" (citing referencing S. Rep. No. 98-225, at 55-56 (1984)).

The court continued: "these arguments may also interact with the present coronavirus pandemic, which courts around the country, including in this district, have used as a justification for granting some sentence reductions." *Id.*

But notwithstanding these comments, district courts throughout the country have not been provided with any guidance as to the limits of their "broad discretion."

The two cases which I have consolidated for the purposes of this opinion reflect the broad range of issues bearing upon factors which I believe the district courts may consider—in addition to those contained in Guideline § 1B1.13 and its

Application Notes and referenced in *Brooker*—in exercising their broad discretion in deciding their compassionate release motions.

Notably, the Sentencing Commission lacked full membership from 2014 through most of 2022, but since August of this year it has been fully constituted. Recently, the Commission announced that one if its top policy priorities for the coming year is to consider possible amendments to § 1B1.13, which has not been amended since the First Step Act was enacted, and to elaborate on what should be considered extraordinary and compelling reasons for sentence reductions under 18 U.S.C. § 3582(c)(1)(A). Notice of Final 2022–2023 Priorities. 87 Fed. Reg. 60438 (Oct. 5, 2022). It is the Court's hope that its decision in this case, and in particular the factors it has identified as extraordinary and compelling, will be of value to the Commission when updating its Guidelines.

### The Russo Case

Anthony Russo ("Russo") is currently incarcerated at the Federal Correctional Complex at Allenwood ("FCC Allenwood") serving a sentence of life plus five years for his role in a murder conspiracy during the Colombo Crime Family War of the early 1990s. At age 70, Russo has served approximately 29 years of his sentence. When Judge Sifton sentenced Russo, the sentencing guidelines were mandatory and called for a sentence of life. However, since the Supreme Court's decision in *Booker* (not to be confused with *Brooker*) the guidelines have since been discretionary. *See*

*United States v. Booker*, 543 U.S. 220 (2005). Russo moves under the First Step Act, for a reduction of his term of imprisonment to time served.

In 1994, a jury convicted Russo and two co-defendants, Joseph Russo and Joseph Monteleone, of racketeering and conspiracy to participate in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") statute, the murders-in-aid of racketeering of John Minerva and Michael Imbergamo, conspiracy to murder members of a faction of the Colombo Crime Family, conspiracy to use extortionate means to collect and attempt to collect lines of credit, and using and carrying a firearm in relation to crimes of violence. Three years later, Judge Sifton granted Russo and his co-defendants a new trial after it came to light that the government had failed to disclose relevant evidence about the credibility of a co-conspirator and key witness.[4] The Second Circuit reversed on appeal, reinstating Russo's conviction, and Judge Sifton sentenced Russo in 1999 to life plus an additional mandatory consecutive term of five years for Russo's use of

---

[4] The government did not disclose at trial that co-conspirator Gregory Scarpa Sr., who was apparently the sole source of cooperating witness testimony linking Russo to Minerva's murder, was an informant for the FBI working with Supervisory Special Agent Roy Lindley DeVecchio. Despite committing many of the murders that occurred as part of the Colombo Crime Family War, Scarpa was not indicted. DeVecchio was later unsuccessfully charged with murder for his role in allegedly assisting Scarpa in four killings. While relevant in terms of procedural history, these facts are not relevant upon consideration of Russo's motion pursuant to 18 U.S.C. §3582(c)(1)(A). *See United States v. Orena*, 37 F.4th 58, 61-62 (2d Cir. 2022).

a firearm during a crime of violence.

Russo's convictions stem primarily from the murders of Imbergamo and Minerva on the evening of March 25, 1992. At the time, the Colombo Family, of which Russo was a captain, was embroiled in a bloody civil war between two factions struggling for control of the Family. At trial, the jury determined that two members of Russo's crew and a member of a separate crew gunned down Imbergamo and Minerva, members of the Family's rival faction, at Russo's behest.

## A. Compassionate Release

Russo argues that he is entitled to compassionate release because of his extraordinary rehabilitation and because of issues related to the COVID-19 pandemic. Without exception, every compassionate release case before me and many I have read from other courts have relied on the pandemic as a basis, if not the sole one, for supporting the "extraordinary and compelling" requirement.

First, Russo has clearly demonstrated that he has achieved extraordinary rehabilitation. In the past 21 of his 29 years served, Russo has not committed a single disciplinary infraction. Given the realities of incarceration in a federal penitentiary, particularly under the specter of a life sentence, this record can only be viewed as exemplary. While incarcerated, Russo has also completed more than 40 educational courses, obtained his GED, and maintained a steady work assignment with a glowing review from his supervisor. In addition, the BOP rates Russo's risk of recidivism as

"minimal." Russo Mot. for Sentence Reduction at Ex. F.

Perhaps the most convincing evidence of his rehabilitation and character are two letters that Russo submitted from staff members at FCC Allenwood. Both refer to Russo as a "model inmate." Russo Mot. for Sentence Reduction at Ex. D, E. In one, Senior Officer Cody Leon writes: "Mr. Russo has consistently shown a desire to not only better himself and the people around him but to improve his environment and community to the best of his abilities." Russo Mot. for Sentence Reduction at Ex. D. Officer Leon describes Russo as "considerate, respectful, trustworthy, and hard-working" and states that it is his "belief that given a second chance, Mr. Russo possesses the desire, ability, and support system needed for him to succeed." *Id*. Allenwood Recreation Specialist Ryan Shuck reiterates this sentiment: "Mr. Russo has been one of the best workers and best men that have [sic] been employed by our department." *Id*. at Ex. E. He describes Russo has having "model behavior," "a tremendous work ethic", "a great attitude", and being "respectful, polite and hard-working." *Id*.

The letters not only extol Russo's behavior while incarcerated and attest to his status as a role-model inmate, but also encourage the Court to give Russo a second chance. The Court finds these letters, combined with Russo's work, disciplinary, and educational history while in prison, nothing short of commendable. Of course,

rehabilitation alone would not suffice as extraordinary and compelling, but it weighs in Russo's favor alongside consideration of multiple other factors.

Next, Russo argues that because of his health issues, he is particularly at risk if he contracts COVID-19 and that, in addition, conditions in FCC Allenwood during the pandemic have made his time incarcerated more punitive than anticipated at the time of sentencing. In the Second Circuit, the COVID-19 pandemic has served as a significant basis for granting compassionate release motions. *See, e.g., Brooker*, 976 F.3d at 238. Russo, in addition to being of an advanced age, has high cholesterol, high blood pressure, and borderline diabetes. These health problems all place Russo at increased risk if he were to contract the virus.

However, as the government points out, Russo is vaccinated against COVID-19 and many courts have denied compassionate release to vaccinated defendants on this basis. *See, e.g., United States v. Folkes*, No. 18-CR-257 (KAM), 2022 WL 1469387, at *6 (E.D.N.Y. May 10, 2022) (collecting cases); *United States v. Johnson*, 2021 WL 640054, at *5 (S.D.N.Y. Feb. 18, 2021); *United States v. Thomas*, Nos. 21-1645 & 21-2105, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022). Still, Russo's vaccination is not dispositive. Each defendant's situation must be assessed individually. The government argues that courts "nearly uniformly" deny compassionate release to vaccinated defendants. Gov't Opp. to Def. Russo's Mot.

for Sentence Reduction at 7; *see id*. However, these cases are distinguishable in one significant way: the *sole* basis for those motions was the risk posed by COVID-19.

Nonetheless, as the government correctly posits, "the threat posed by COVID-19 will regrettably be a continuing one that broadly impacts all of society (whether individuals are incarcerated or at liberty) for many years." Gov't Opp. to Def. Russo's Mot. for Sentence Reduction at 7. Though Russo's heightened risk of COVID-19 may not alone suffice as an extraordinary and compelling reason, in combination with the other factors, it weighs toward granting a reduction.

In addition to the health risks posed by the pandemic, the restrictions at FCC Allenwood during the pandemic have made Russo's incarceration much more punitive than originally contemplated at the time of sentencing. *See United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) ("It might seem, however, that this first factor [of COVID-19]…would diminish in importance once the pandemic was over. But this is not entirely so. For…aside from posing a threat to Rodriguez's health, [the pandemic] has made Rodriguez's incarceration harsher and more punitive than would otherwise have been the case"). For example, nearly 24-hour lockdowns have been repeatedly imposed for long stretches to prevent the spread of COVID-19. In addition, Russo states that he was not permitted to have visitors for over a year, and that family visits now only occur though a glass partition. These measures, while aimed at protecting inmates from illness, also have an

indisputably punitive effect. Again, while this factor may not independently constitute an extraordinary or compelling reason, it weighs towards a sentence reduction.

When all of the above factors are considered together, the Court finds that they rise to the level of extraordinary and compelling. The Court therefore will turn to a consideration of the § 3553(a) factors to determine whether Russo is entitled to a reduced sentence.[5]

But before doing so, there are other factors in this case which merit consideration supportive of the Court's finding that extraordinary and compelling circumstances are extant.

## 1. Changes in sentencing law

At the time Judge Sifton sentenced Russo, the sentencing guidelines were mandatory. Since *Booker* they have been discretionary. Had Russo been sentenced today, the guidelines range would still be life. However, the sentencing court would not be constrained to impose a life sentence and could more meaningfully account for the other sentencing factors at play. This circumstance alone probably can be considered extraordinary and compelling to support the Court's "broad discretion."

---

[5] Russo will turn 70 years old in February 2023 and in April 2023 will mark 30 years in prison. The Court has determined that the extraordinary circumstances predicate has been satisfied. But, if he did not bring this motion until he had served 30 years, the Court would then be required to go directly to the consideration of the § 3553(a) factors. *See* 18 U.S.C. § 3582 (c)(a)(A)(ii).

But, in any event, it certainly can be considered a factor in combination with the other prevalent factors.

*Booker* is not retroactive, as the Government points out. *See Guzman v. United States*, 404 F.3d 139, 144 (2d Cir. 2005). But that is relevant only as to the sentencing— *Guzman* does not preclude consideration of a significant post-sentencing change in the law as an extraordinary circumstance. *See United States v. Ramsay*, 538 F. Supp. 3d 407, 426 (S.D.N.Y. 2021) ("The Court would find extraordinary and compelling reasons for a sentence reduction even if it had sentenced Ramsay to life imprisonment as a matter of discretion. But these extraordinary circumstances are all the more compelling because, when the Court previously imposed its sentence, it had no choice in the matter."); *see also United States v. Parker*, 461 F. Supp. 3d 966, 981 (C.D. Cal. 2020) ("The court finds that it has authority under 18 U.S.C. § 3582(c)(2) to modify Stanback's sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a)." (quoting *United States v. Stanback*, 377 F. Supp. 3d 618, 625 (W.D. Va. 2019))).

## 2. Sentencing disparities amongst co-defendants

One of the sentencing court's requisite considerations is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). This provision "was intended to eliminate national disparity." *United States v. Wills*, 476 F.3d 103, 109 (2d Cir.

16

2007). Nonetheless, it "does not on its face restrict the kinds of disparity a court may consider." *Id.*

Courts have found that a gross disparity between sentences of co-defendants stemming from their choice to exercise or forgo their constitutional right to a trial is an extraordinary and compelling factor. *See United States v. Ballard*, 552 F. Supp. 3d 461, 468 (S.D.N.Y. 2021) (finding that a drastic sentencing disparity between co-defendants, which resulted in part from the fact that Ballard opted to exercise his right to trial when his co-defendant accepted a plea deal, supported a determination that extraordinary and compelling circumstances warranted a reduction of the defendant's sentence); *see also United States v. Haynes*, 465 F. Supp. 3d 496, 514 (E.D.N.Y. 2020) ("The Court readily concludes, on the facts as detailed above—including the brutal impact of Haynes's original sentence, its drastic severity as compared to codefendant Rivers's ten-year term, its harshness as compared to the sentences imposed on similar and even more severe criminal conduct today, and the extent to which that brutal sentence was a penalty for Haynes's exercise of his constitutional right to trial—…[constitute] an extraordinary and compelling circumstance warranting relief under § 3582(c).").

Russo exercised his constitutional right to trial. Of Russo's fourteen co-defendants, seven went to trial. Six received mandatory life sentences under the then-mandatory sentencing guidelines. The seventh was acquitted.

17

In contrast, the remaining co-defendants received sentences ranging from time-served, equating to approximately four years, to 270 months. The offense conduct of these defendants, although ultimately charged differently by the government than those defendants who proceeded to trial, was no less violent or destructive than those who received life sentences. For example, co-defendant Theodore Persico pleaded guilty for charges including conspiracy to commit murder and received a sentence of 270 months. Co-defendant Richard Fusco received a sentence of 168 months after pleading guilty. He was originally charged with conspiracy to commit murder.

This disparity does not reflect the goals of sentencing. And, while the government's argument that accepting responsibility for one's crimes should result in a lower sentence is well taken, it is often disproportionately reflected in how co-defendants are charged and sentenced. Thus, this disparity in sentencing also weighs toward a finding of extraordinary and compelling circumstances.

## B.   18 U.S.C. § 3553(a) Factors

The § 3553(a) factors that district courts must consider in deciding a motion for compassionate release are: (i) the nature and circumstances of the offense,  (ii) the history and characteristics of the defendant, (iii) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, (iv) the need to adequately deter criminal conduct, (v) the need to

protect the public from the defendant, (vi) the need to provide the defendant with necessary rehabilitation, and (vii) the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

The argument can plausibly be made that no one convicted of murder should ever have their sentence reduced and that when a judge sentences a defendant to life for murder the judge intends that the defendant should die in prison. Indeed, in *United States v. Orena*, even though the defendant satisfied the extraordinary circumstances threshold given his poor health and advanced age, the district judge, in not reducing Orena's life sentence, considered his murder convictions to outweigh the § 3553(a) factors. *See* 37 F.4th 58 (2d Cir. 2022).

Even though I am similarly troubled by the fact that Russo orchestrated two murders, I do not subscribe to that unyielding punitive concept in this case for a number of reasons:

First, the same sentencing disparities between defendants who chose to exercise their constitutional right to trial and those who took plea deals—even though they were also indicted on murder charges—is not only is a factor worthy of consideration as an extraordinary circumstance, but also is a powerful § 3553(a) factor. If the Government in offering its plea deals did not believe that all those indicted on murder charges should be sentenced to life, why should the court?

19

The sentences resulting from the plea deals that the government entered into align with the national average for murder convictions. *See, e.g., Graham v. Florida,* 560 U.S. 48, 93 (Roberts, J., concurring) (noting that a life-without-parole sentence was "far more severe than the average sentence imposed on those convicted of murder or manslaughter, who typically receive under 25 years in prison"); *United States v. Qadar,* No. 00-CR-603, 2021 WL 3087956, at *12 (E.D.N.Y. July 22, 2021) (noting that the average federal murder sentence in fiscal year 2020 was approximately 21 years); *United States v. Tellier*, No. 92-CR-869, 2022 WL 1468381, at *4 (noting that according to U.S. Sentencing Commission statistics, for fiscal years 2015-2021, the median sentence and length of imprisonment for murder was 240 months, and the mean sentence and length of imprisonment for murder was 262 and 263 months, respectively).

These statistics support the notion that murders are not homogeneous. At the risk of sounding cynical, there are different types of murders with different degrees of culpability. For example, there are murders of passion and murders of revenge. Here the murders were not directed at the public at large but were internecine executions of ruthless rival gang members. This turf warfare between rival factions of the Colombo family thirty years ago, where the mantra was probably "kill or be killed," is ancient gangland lore. Thus, due to the nature and circumstances of the offense, Russo's release at this time, and at his advanced age, is unlikely to pose a

danger to the general public, satisfying the sentencing goal "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

In any event, Russo paid a steep price for proceeding to trial. Although he was sentenced appropriately, this does not – nor should not – preclude his entitlement to a reduced sentence if the § 3553(a) factors warrant.

And here, Russo has more than satisfied those factors. Chief amongst them is his extraordinary rehabilitation. He became a model inmate even though he knew, prior to the advent of the First Step Act, that he would be spending his life behind bars. Rehabilitation is indeed one of the goals of sentencing and "evidence of post-sentencing rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" *Pepper v. United States*, 562 U.S. 476, 491 (2011). Thus, like sentencing disparity, rehabilitation is a factor in combination with others for both assessing extraordinary and compelling circumstances and § 3553(a) considerations.

Given these factors, the BOP has appropriately rated Russo's prospect of recidivism as "minimal." *See* Russo Mot. for Sentence Reduction at Ex. F.

In sum, having considered all the § 3553(a) factors, as well as the nature of Russo's crimes of conviction, the Court believes that a sentence reduction to 35 years is warranted plus a lifetime of supervised release. *See Brooker,* 976 F.3d at 237 ("It bears remembering that compassionate release is a misnomer. [The First Step Act] in fact speaks of sentence reduction. A district court could, for instance, reduce but

21

not eliminate a defendant's prison sentence."). This sentence appropriately promotes respect for the law, provides just punishment, adequately deters criminal conduct, protects the public from the defendant, and avoids unwarranted sentencing disparities, satisfying the principal factors to be considered under 18 U.S.C. § 3553(a). Moreover, this sentence is at least ten years more than what his similarly situated co-defendants received under their plea deals—and which he might also have received if he did not go to trial—and is a significant price for Russo to have paid for exercising his right to trial.

### The Moore Case

Paul Moore was a member of a narcotics trafficking ring known as the Vassell Enterprise from approximately 1985-1991. Like too many defendants, Moore grew up surrounded by violence. In his native Jamaica, he was raised in a neighborhood plagued by gangs. At age 14, he witnessed the murder of his neighbor and was ordered by the killer to drag the body out of the street. Years later, Moore himself was shot multiple times while trying to protect his son and niece during a drive-by shooting. At age 17, Moore immigrated to the United States and moved in with his aunt and uncle in Brooklyn. It was through them that he met and befriended the Vassell family. Moore began dating Winsome Vassell and the couple eventually had two children together. Winsome's brother, Eric Vassell, was the head of the violent Vassell Enterprise.

In 1991, a jury convicted Moore of racketeering (in violation of RICO), conspiracy to distribute cocaine and heroin, committing a violent crime in aid of racketeering, money laundering, and structuring illegal money transactions. The predicate acts for the RICO count were narcotics conspiracy, money laundering, attempted murder and murder. Moore's role in the Vassell Enterprise was that of an enforcer. Eric Vassell apparently charged Moore with expanding operations of the violent drug ring to Texas. There, when Moore was 22 years old, he and one of his co-defendants shot and killed a rival drug dealer. Shortly after, Moore also shot one of his co-defendants in the leg to discipline him for disrespecting Vassell.

As with Russo, at the time that Moore was sentenced the sentencing guidelines were mandatory and then-District Judge Raggi was constrained to sentence Moore to life in prison: "[The] argument that the defendant should be given some hope is not without considerable appeal to the Court, but I do not see a principled ground for departure and I am obliged to follow the guidelines." Sentencing Tr. At 14:8-11. At the time that he was incarcerated, Moore was 24 years old. He has now served approximately 32 years in prison.

### A. Compassionate Release

Moore argues that he is entitled to compassionate release because of the change in sentencing law post-*Booker* and the sentencing disparity among

23

similarly situated co-defendants. For the reasons that follow, the Court agrees and grants Moore's motion in part.

As with Russo, Moore's sentence was dictated by a sentencing regime that was declared unconstitutional in *Booker*. The Court therefore once again finds that a mandatory life sentence dictated by an unconstitutional sentencing regime constitutes an extraordinary and compelling factor.

Moreover, like Russo, Moore has also been the victim of sentencing disparities. Only Moore and one of his 46 co-defendants are serving life sentences. All others are serving or have served sentences of 33 years or less. However, this is not necessarily because of a variance in offense conduct. Eric Vassell, who accepted a plea deal, murdered two people and ordered the murders of several others. He is scheduled to be released from prison in December after serving approximately 25 years.

In addition to Vassell, other defendants who were similarly situated to Moore but who accepted plea deals received significantly lighter sentences, despite engaging in similarly violent conduct. For example, co-defendant Andrew Barrington was convicted of violating the Violent Crimes in Aid of Racketeering ("VICAR") statute with predicates that included first-degree murder. He was sentenced to ten years and was released in 2000. Co-defendant Robert Bell, who was also directly involved in a murder, pleaded guilty to VICAR with predicates

including first-degree murder and received a ten-year sentence. Another co-defendant, Nigel Demetrius, received a sentence of 20 years for offense conduct that included first-degree murder.

Because this sentencing disparity results primarily from Moore exercising his right to trial rather than sentencing factors or the general goals of sentencing, and because of the gross disparity between similarly situated co-defendants who received much lower sentences, the court finds that, as with Russo, this is an extraordinary and compelling circumstance warranting re-consideration of Moore's life sentence. *See Ballard*, 552 F. Supp. 3d at 468; *Haynes*, 465 F. Supp. 3d at 514.

Moore, like Russo, also has an exemplary behavioral record in prison, with no disciplinary infractions in the past 18 years, and only 4 infractions prior to that, all of which were non-violent. Given the hopeless reality of a life sentence, this disciplinary history should not be understated. Moore has also taken more than 40 classes, is actively involved in his church, maintains a job as a unit orderly, and is the assistant commissioner for one of the soccer leagues at his facility. Moore's supervisor in this role for the past seven years, USP Allenwood Recreation Specialist Ryan Schuck wrote a letter supporting Moore's motion describing him as "one of the best workers and best men that [he] has been around." Moore Supp. Memo. of Law, Mot. for Sentence Reduction at Ex. 7. Schuck describes Moore as "consistent and trustworthy," having "high character and a great attitude," and

being "well-respected by both staff and inmates alike." He gives his "highest recommendation" that the Court "strongly consider giving this man a second chance." *Id*. In combination with all the other factors, this further weighs toward a finding of extraordinary and compelling circumstances.

## B.   18 U.S.C. § 3553(a) Factors

As with Russo, Moore's exemplary record of rehabilitation during his time in prison weighs heavily in the Court's consideration. Though at age 56 he is not considered an elderly inmate under the BOP's guidelines, Moore was 24 years old when he was incarcerated and only about 19 years old when he first became involved in illegal activity with the Vassell Enterprise. Moore's young age at the time of his illegal activity combined with his record of rehabilitation since then points to Moore being a changed man. *See United States v. Ramsay*, 538 F. Supp. 3d 407, 423 (S.D.N.Y. 2021) (discussing at length the role of a defendant's age in sentencing and how a defendant's age should be considered in deciding motions for compassionate release).

In addition, like Russo, Moore's murders were internecine gang killings. And, the BOP also considers Moore's recidivism risk to be "minimal." *See* Moore Pro Se Mot. for Sentence Reduction at Ex. D.

But there is a further reason why Moore is unlikely to pose a danger to the community after release—he has consented to deportation. *See United States v.*

26

*Francis*, No. 06 CR 80 (NRB), 2021 WL 242461, at *2 (S.D.N.Y. Jan. 22, 2021) (granting a motion for compassionate release and finding within the § 3553(a) analysis that the defendant "will not pose a danger to any persons or to the community" because he was to be removed upon release); *see also United Brooker*, 976 F.3d 228 at 232-33 (circumstances considered "did not have to be unforeseen at the time of sentencing").[6]

Still, the Court does not intend to understate the seriousness of Moore's criminal history. The Vassell Enterprise was a brutal operation exacting violence across state lines and damaging communities with its distribution of narcotics. Therefore, the Court finds that time-served is not the appropriate sentence for Moore. Rather, a new sentence of 35 years more sensibly reflects the goals of sentencing by accounting for the serious nature of Moore's offenses, promoting respect for the law, providing just punishment, the value of rehabilitation, and the need to avoid sentencing disparities.[7]  Therefore, Moore's motion is granted in part and his sentence is reduced from life imprisonment to 35 years.

---

[6] Because Moore is only 56, had he not been subject to deportation, the Court may have found that a longer sentence was warranted in light of his relatively young age.

[7] Because Moore will be deported, a sentence of supervised release is not pragmatically indicated.

27

## CONCLUSION

I am letting two murderers sentenced to life out of prison. But I have painstakingly endeavored to explain why it is the appropriate thing to do under the First Step Act.

The Act was a remarkable piece of bipartisan legislation by an otherwise divided Congress and reflected the realization by lawmakers on both sides of the aisle that sentencing reform of the judicial system was sorely needed. It came at a time when "we [had] reached a point in our judicial decision-making that 'reflect[ed] poorly on our legal system.'" *May v. Shinn*, 37 F. 4th 552, 555 (9th Cir. 2022) (Block, J., concurring) (quoting *May v. Shinn*, 954 F.3d 1194, 1209 (9th Cir. 2021) (Friedland, J., concurring)).

Proponents of the Act have "lauded it as a success for the movement to end mass incarceration."[8] But it is much more than that worthy goal. It injects into our legal system a compassionate dimension that indeed, as in these two cases, transcends the strictures of the law and represents the "humane thing to do in the interests of justice." *May*, 37 F.4th at 562.

And it is a win-win for defendants who have been harshly sentenced and for our prison system and society. In addition to assuaging the problem of mass

---

[8] Siobhan A. O'Carroll, *"Extraordinary and Compelling" Circumstances: Revisiting the Role of Compassionate Release in the Federal Criminal Justice System in the Wake of the First Step Act*, 98 Wash. U. L. Rev. 1543, 1548 (2021)

incarceration, the Act provides a powerful incentive for good behavior during long terms of incarceration, making clear that meaningful rehabilitation is a prisoner's best chance at obtaining a second chance at living a law-abiding life.[9] This can also benefit the prison system because it should logically result in fewer internal disciplinary proceedings with problem prisoners. The release of 4,000 prisoners since the Act was enacted suggests that the sentencing goal of rehabilitation was accomplished in each of those cases. It also produced considerable savings for the taxpayers who annually pick up the approximately $81 billion annual tab for mass incarceration.[10]

Congress should be lauded for enacting the First Step Act and the judiciary should wholeheartedly embrace it.

---

[9] *See* Shon Hopwood, Second Looks & Second Chances, 41 Cardozo L. Rev. 83, 99 (2019).

[10] According to numbers published by the Bureau of Justice Statistics, the U.S. spends approximately $81 billion yearly on prisons, jails, parole, and probation. Peter Wagner and Bernadette Rabuy, *Following the Money of Mass Incarceration*, Prison Policy Initiative, Jan. 25, 2017, https://www.prisonpolicy.org/reports/money.html. The latest data published by the Federal Register places the average cost per federal inmate at $35,347. Annual Determination of Average Cost of Incarceration (COIF), 86 Fed. Reg. 49060 (Sept. 1, 2021).

**SO ORDERED.**

_/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
November 2, 2022